AO 106 (REV 4/10) Affidavit for Search Warrant     AUSA Christopher V. Parente, (312) 886-2447

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**F I L E D**

MAR 25 2019

MAGISTRATE JUDGE, JEFFREY COLE
UNITED STATES DISTRICT COURT

### UNDER SEAL

In the Matter of the Search of:    Case Number:

The single family home and unattached garage
located at 3110 South 53rd Court, Cicero, Illinois,
further described in Attachment A

**19 M 207**

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Ashley N. Kizler, a Special Agent of the Federal Bureau of Investigation, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

**See Attachment A**

located in the Northern District of Illinois, there is now concealed:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is evidence, instrumentalities, and fruits.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Sections 1581, 1584, 1589, and 1590. | peonage, labor trafficking, and human trafficking |

The application is based on these facts:

**See Attached Affidavit.**

Continued on the attached sheet.

_____
*Applicant's Signature*

ASHLEY N. KIZLER, Special Agent, Federal Bureau of Investigation
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 25, 2019

_____
*Judge's signature*

City and State: Chicago, Illinois

JEFFREY COLE, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT    )
                                       )

NORTHERN DISTRICT OF ILLINOIS   )

## **AFFIDAVIT**

I, Ashley N. Kizler, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately March 2012. As part of my duties as an FBI Special Agent, I investigate criminal violations relating to civil rights offenses, to include human trafficking and labor trafficking, and crimes against children. I have participated in investigations involving violations of various federal laws, including public corruption, wire fraud and mail fraud, forced labor, sex trafficking of children and through means of force, fraud and coercion. I have also participated in the execution of multiple federal arrest warrants and search warrants

2.     This affidavit is made in support of an application for a warrant to search the single-family home and unattached garage located at 3110 South 53rd Court, Cicero, Illinois, described further in Attachment A (the **"Subject Premises"**), for evidence, instrumentalities, and fruits described further in Attachment B, concerning peonage, labor trafficking, and human trafficking offenses, in violation of Title 18, United States Code, Sections 1581, 1584, 1589, and 1590.

3.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included

each and every fact known to me concerning this investigation. I have set forth facts

that I believe are sufficient to establish probable cause to believe that evidence,

instrumentalities, and fruits, of violations of Title 18, United States Code, Sections

1581, 1584, 1589, and 1590 are located at 3110 S 53rd Court, Cicero, Illinois.

## I.    FACTS SUPPORTING PROBABLE CAUSE TO SEARCH

### A.    BACKGROUND OF INVESTIGATION

#### 1.    2014 ALLEGATIONS

4.      In March 2014, FBI received a tip regarding possible human trafficking.

The tipster, Victim A[1], stated that she was a victim of human trafficking.  Victim A

identified her trafficker as CONCEPCION Malinek ("CONCEPCION"), who resided

at the **Subject Premises**. Victim A stated that CONCEPCION brought her to the

United States from Guatemala in 2010, in exchange for $5,000.  After arriving in the

United States, Victim A stated that CONCEPCION continued to increase the amount

of money Victim A owed her, preventing Victim A from leaving the **Subject**

**Premises**.  Victim A stated she lived in the basement of the **Subject Premises** for

the majority of her time residing at the **Subject Premises**.  Victim A stated she was

only allowed to leave the basement to go to work and bring money to CONCEPCION

in order to pay off her debt.  Victim A stated that during her time at the **Subject**

---

[1] Victim A was interviewed by telephone two times and in person two times. Victim A refused to provide her identifying information out of fear that her family in Guatemala would be harmed.  Victim A did not believe her family in Guatemala could be protected by U.S. authorities if she assisted in the investigation.  Victim A returned to Guatemala in August 2014 and the investigation was closed at that time.

**Premises**, CONCEPCION threatened Victim A's children who lived in Guatemala and constantly threatened and humiliated Victim A. Victim A also reported that there were other individuals living in the basement of the **Subject Premises**, including minors.

5. On March 11, 2014, and March 19, 2014, law enforcement interviewed Victim A by telephone. Victim A stated she wanted to remain anonymous and did not want to come forward due to fear for the safety of her family living in Guatemala. Victim A stated that CONCEPCION and her husband, Jeffrey Malinek, owned a hotel in Guatemala. Victim A stated she came to the United States illegally without any authorization. Victim A stated she arrived in Indiana and was transported to the **Subject Premises** by Jeffrey Malinek.

6. Victim A stated she was required to stay at the **Subject Premises** until she repaid CONCEPCION approximately $8,000, which was the amount owed for her travel to the United States. Victim A stated that CONCEPCION continued to raise the amount of money she owed and it took Victim A four years to pay off her debt to CONCEPCION. Victim A estimated she paid CONCEPCION approximately $23,000 in total.

7. Victim A stated that CONCEPCION charged her rent to live at the **Subject Premises** and would charge the other victims staying there for any type of service. For example, Victim A stated CONCEPCION charged the victims $25 for a ride to town. Victim A stated that there were five to eight other victims living in the

3

basement of the **Subject Premises** while she was there. Victim A stated the victims would leave the **Subject Premises** to go to work but had to return at the end of the day. Victim A stated nobody was allowed to move out of the **Subject Premises** until their debt was repaid.

8.    Victim A stated that at one point she moved out of the **Subject Premises** and into a residence with Victim A's boyfriend. Victim A stated that CONCEPCION continued to threaten and harass Victim A in order to get Victim A to move back to the **Subject Premises**. As part of these threats, Victim A stated that CONCEPCION told her "If you don't pay, I will call immigration and have you deported." Victim A responded by stating she would tell immigration what CONCEPCION was doing and CONCEPCION responded that Victim A was in the country illegally and did not speak English so no one would listen to her. Victim A moved back to the **Subject Premises** in order to stop the harassment by CONCEPCION.

9.    On April 24, 2014, law enforcement met in person with Victim A. Victim A reiterated the statements from her two prior telephone interviews with law enforcement. Victim A further stated that CONCEPCION would loan her money very easily, but would charge excessive interest rates which would take Victim A years to repay. Victim A moved back into the **Subject Premises** with her boyfriend and CONCEPCION charged her $300 a month for rent. Victim A paid CONCEPCION

4

$800 per month, $500 to reduce her debt and $300 for rent. After a few years, Victim A paid off her debt and left the **Subject Premises.**

10.    Victim A stated that the other victims living in the basement of the **Subject Premises** had to pay $200 per month for rent plus other fees to CONCEPCION. Victim A stated nobody was allowed to leave the **Subject Premises** until the debt was paid off. Victim A stated that CONCEPCION was charging $7,000 to bring aliens from Guatemala to the United States and another $4,000 in expenses once they arrived at the **Subject Premises.** Victim A explained if anyone missed a payment on their debt CONCECPCION charged a late fee of $100-$200.

**2.    March 2019 Investigation.**

11.    In March 2019, FBI received information from Individual A regarding a potential victim of human trafficking.[2] Individual A stated that a coworker, Victim B, told Individual A he was being held in a basement in Cicero with twenty other Guatemalans and forced to work by a female who owned the residence.

12.    On March 15, 2019, law enforcement contacted Individual A regarding the above information. Individual A stated that Victim B, along with Victim B's wife, Victim C, work with Individual A at a factory in Romeoville, Illinois. Individual A stated that Victim B told Individual A that Victim B and Victim C, along with approximately 5 other Guatemalan employees at the factory are all living in the

---

[2] Individual A is an employee at a factory located in Romeoville, Illinois. Individual A has no criminal history and is receiving no benefits from the providing of this information.

basement of the **Subject Premises.** Individual A stated that Victim B told Individual A the owner of the **Subject Premises** is a woman who keeps an eye on them constantly and they were all brought to the United States by a "coyote" [slang for alien smuggler][3] who knows the owner of the **Subject Premises**. Victim B further told Individual A that the woman who owned the **Subject Premises** does not let the victims go anywhere without her and that she transports them to work every day in a white passenger van and picks them up after their shift. Individual A further stated that Victim B told Individual A the victims pay $450 per month in rent plus $50 per person for transportation to/from work. The woman also charged the victims to watch any children they have at the **Subject Premises** while they go to work. Individual A stated that Victim B told Individual A he is scared to talk to law enforcement because the woman constantly threatens him and the others with immigration consequences if they talk about their arrangement.

13.     On March 21, 2019, and March 23, 2019, law enforcement interviewed Victims B and C.[4]   On March 23, 2019, law enforcement interviewed Victim D. Victims B, C, and D have all claimed political asylum in the United States and have pending asylum cases with the United States government. No promises or payments have been made to them regarding this investigation.

---

[3] This is my interpretation of the term "coyote" based on my training and experience.

[4] Victims B and C are married and are both in the United States Illegally. Victims B and C were made no promises by law enforcement.

### a.  Victim B

14.  Victim B is a citizen of Guatemala.  Victim B stated he travelled to the United States in May 2018 along with his 12 year old son, and was detained by immigration authorities.  Victim B contacted CONCEPCION by telephone and agreed with CONCEPCION to provide CONCEPCION's name and residence as the place he would be staying.[5]  Victim B stated that CONCEPCION charged him $7,000 for getting him to the United States.[6]  Victim B stated that he paid CONCEPCION approximately $600 per month to pay off his debt.  Victim B stated that his passport was seized by immigration officials and two times per month CONCEPCION drives him to meet with someone who Victim B believes to be a U.S. Immigration official. Victim B states that these meetings are brief and CONCEPCION charges him $50 for the ride to each visit.  Victim B stated that two weeks ago CONCEPCION arranged for his wife and second child to come to the United States in exchange for $30,000.  Victim B agreed to a similar payment plan with CONCEPCION to have his wife and child brought over to the United States.

15.  Victim B stated that he and his wife live in the basement of the **Subject Premises**, along with their 10 year old daughter and 12 year old son.[7]  Victim B stated there are approximately 34 people living in the **Subject Premises**, including

---

[5] Victim B stated his mother provided him with CONCEPCION's telephone number before he left Guatemala.

[6] Victim B identified a photograph of CONCEPCION Malinek as the individual he knew who owned the **Subject Premises** and who controlled his debt.

[7] Victim B stated his 10 year old daughter is not in school.

approximately 16 children. Victim B provided law enforcement with the names of seven other individuals living in the basement of the **Subject Premises**. Victim B stated that the majority of the individuals in the basement are aliens claiming political asylum, but at least two of the aliens are in the United States illegally with no pending asylum claim.

16.     Victim B stated that CONCEPCION gave all the victims their own cell phone to use to communicate with her and others. Victim B stated that every Thursday all victims are required to be in the **Subject Premises** for a house visit by immigration officials.[8] Victim B stated that CONCEPCION would call each family upstairs on Thursday, using their cell phones to reach them, one at a time, to meet with the "immigration officials."

17.     Victim B stated that after arriving at the **Subject Premises**, CONCEPCION told him he owed her $7,000 for her bringing him to the United States. Victim B stated CONCEPCION sent him to a temporary employment agency and told him to request to work at Company A. Victim B stated that many of the other individuals living in the basement of the **Subject Premises** also work at Company A. All the individuals work the same shift, 3:00p.m. through 12:30a.m. Monday through Friday. Victim B explained that CONCEPCION would drive all the victims from the **Subject Premises** to Company A and pick them up at the end of the night.

---

[8] Law enforcement has identified the alleged "immigration officials" to be an organization affiliated with an Intensive Supervision of Aliens Program which is a government contractor used to monitor immigrants in the United States awaiting disposition of their removal cases

The victims would immediately return to the basement of the **Subject Premises**.

CONCEPCION charged each victim $50 per week for transportation to/from work.

18.     Victim B explained that he was paid approximately $1,956 per month

from Company A.  He would cash his checks at a currency exchange and have to pay

CONCEPCION the following amounts every month: (1) $200 towards his debt; (2)

$424 for "bills"[9]; (3) and $100 for rides to/from work.

**b. Victim C**

19.     Victim C is a citizen of Guatemala.  Victim C is married to Victim B and

has two children who reside at the **Subject Premises** with her.  Victim C has a

pending political asylum application with the United States.

20.     Victim C explained that she arrived at the **Subject Premises** in

approximately March 2019, approximately two weeks ago.  Victim C stated that

CONCEPCION[10] charged her $30,000 for bringing her and her daughter to the

United States.  After Victim C's arrival at the **Subject Premises**, CONCEPCION

sent Victim C to a temporary staffing agency and told Victim C to be asked to be

placed at Company A.  Victim C did as instructed and currently works at Company

A.  Victim C explained that she uses her salary to pay off her debt to CONCEPCION.

---

[9] Victim B was unable to identify what "bills" this covered.   Victim B explained
CONCEPCION just told him it covers "bills."

[10] Victim C identified a photograph of CONCEPCION Malinek as the individual she knew
who owned the **Subject Premises** and who controlled her debt.

21.     Victim C stated that CONCEPCION told her if she said anything to anyone she would lose her kids.  Victim C stated that CONCEPCION is verbally abusive to the victims.  Victim C stated CONCEPCION has told them, "immigration knows how many people live in this house, you guys are poor and I have all the money." Victim C also stated that, at times, CONCEPCION challenged the victims to call immigration officials to report their living situation, explaining, "they already know you are here, so go ahead and call them." Victim C believed that CONCEPCION meant if Victim C tried to contact the authorities for help that they would not help her.

22.     Victim C showed agents videos she took of the basement on her cell phone that CONCEPCION gave her of the **Subject Premises**.  The videos depict a basement setting with multiple bunk beds and sheets hanging from the ceiling as room dividers.

23.     Victim C stated that CONCEPCION posted "rules" on the door going from the basement to the upstairs.  One of the "rules" stated that the basement had to be clean before everyone left for work and they would have to pay a fine.  Another "rule" was a schedule for cleaning the **Subject Premises** that had all of the victims with a different cleaning shift.  None of the victims were compensated for their cleaning services.

### c. **Victim D**

24.     Victim D is a citizen of Guatemala.  Victim D resides at the **Subject Premises** with his 15 year old daughter.  Victim D has a pending political asylum application with the United States.  Victim D stated he paid Guatemalan officials $14,000 to get to the United States.  Victim D knew CONCEPCION from working construction at her hotel in Guatemala. In December 2019, Victim D and his 15 year old daughter crossed the border in Texas and claimed political asylum.  Victim D provided immigration officials with CONCEPCION's name and the **Subject Premises** as the residence he would be residing at pending his asylum claim.  After arriving at the **Subject Premises**, Victim D stated CONCEPCION[11] told him he owed her $18,000 for letting him use her name and residence on his asylum application and for getting him from the border to the **Subject Premises**.  Victim D stated he took a bus from the border to Chicago.

25.     After Victim D's arrival at the **Subject Premises**, CONCEPCION sent Victim D to a temporary staffing agency and told Victim D to be asked to be placed at Company A.  Victim D explained he makes approximately $1,956 a month working at Company A. From that he pays CONCEPCION a total of $974 per month.  The money CONCEPCION charges Victim D per month is detailed as follows: (1) $200

---

[11] Victim D identified a photograph of CONCEPCION Malinek as the individual he knew who owned the **Subject Premises** and who controlled his debt.

towards his debt; (2) $424 for "bills"[12]; (3) $200 for transportation to/from work; (4) $35 for the phone CONCEPCION gave him; (5) $10 for an unknown fee. Victim D explained that CONCEPCION keeps track of all amounts owed in a ledger which she fills in after each payment. Victim D described the ledger as a standard looking notebook which is kept inside the **Subject Premises.**

26.     Victim D stated that he lives in the basement but that his 15 year old daughter resides on the first floor of the **Subject Premises**. Victim D stated nobody is allowed to leave the basement of the **Subject Premises** to go upstairs unless they call CONCEPCION and receive permission.[13] Victim D stated that his daughter is allowed to come down to the basement to visit him, but only for limited periods of time. Victim D stated his daughter does not go to school and he is unsure what she does during the day.

**3.     The Subject Premises**

27.     According to Cook County Recorder of Deeds records, CONCEPCION and Jeffrey Malinek are the owners of the **Subject Premises,** and have owned it since approximately May 20, 2008

28.     According to Illinois Secretary of State Records, CONCEPCION's Illinois driver's license lists her residence as the **Subject Premises.**

---

[12] Victim D was unable to identify what "bills" this covered. Victim D explained CONCEPCION just told him it covers "bills."

[13] This statement was corroborated by Victims B and C.

12

29.     On March 15, 2019, law enforcement conducted surveillance of the **Subject Premises**. Parked in front of the **Subject Premises** was a white passenger van bearing Illinois license plate BE20996 (the "CONCEPCION van").[14]    At approximately 1:16p.m., law enforcement observed approximately 8 to 10 individuals exit the **Subject Premises** and enter the passenger van.   Law enforcement followed the van to the highway and later spoke to Individual A who confirmed the employees were dropped off in a white van bearing Illinois license plate BE20996.

30.     On March 23, 2019, law enforcement conducted surveillance of the **Subject Premises.**   At approximately 1:26a.m., law enforcement observed the CONCEPCION van pull up in front of the **Subject Premises** and observed approximately 10 to 12 individuals exit the van and enter the **Subject Premises.**

31.     Based upon my training and experience working human trafficking and labor trafficking investigations, I know that traffickers typically use their cell phones to communicate with victims and coconspirators.

## II.     SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

32.     Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most

---

[14] According to Illinois Secretary of State records, the van is registered to CONCEPCION Malinek at the **Subject Premises**.

or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

      a.    Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

      b.    Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

33.     In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

34.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## III.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

35.     Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

36.     The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

15

a.  examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.  surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.  opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

37.  The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

16

## IV.    CONCLUSION

38.    Based on the above information, I respectfully submit that there is probable cause to believe that peonage, labor trafficking, and human trafficking offenses, in violation of Title 18, United States Code, Sections 1581, 1584, 1589, and 1590 have been committed, and that evidence, instrumentalities, and fruits relating to this criminal conduct, as further described in Attachment B, will be found in the Subject Premises, as further described in Attachment A.   I therefore respectfully request that this Court issue a search warrant for the single-family home and detached garage located at 3110 S 53rd Court, Cicero, Illinois, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B.

FURTHER AFFIANT SAYETH NOT.

Ashley N. Kizler
Special Agent
Federal Bureau of Investigation

Subscribed and sworn
before me this 25th day of March, 2019

Honorable JEFFREY COLE
United States Magistrate Judge

17

**ATTACHMENT A**

**DESCRIPTION OF PREMISES TO BE SEARCHED**

The residence and detached garage is located at 3110 South 53rd Court, in Cicero, Illinois. The residence is a single family home, brown in color, with a white door, and depicted below:



## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, and fruits concerning violation of Title 18, United States Code, Sections 1581, 1584, 1589, and 1590, as follows:

1. Cell phones.

2. Cash.

3. All financial documents, including bank statements, check books, invoices, ledgers, currency exchange records, receipts, and credit card statements.

4. All notebooks containing handwritten notations relating to known or potential victims.

5. All items relating to Victims A-D and their children.

6. Indicia of ownership or occupancy of the Subject Residence.

7. Written documents containing rules or instructions to individuals living inside the residence.

8. Any documents bearing the names or identifying information of any known or potential trafficking victims.

9. All documents relating to the trafficking and forced labor of known or potential victims.

10. All employment documents related to the employment of any identified or potential victims of this investigation.

11.  All immigration documents, including passports, lawful permanent resident cards, and other immigration forms or correspondence relating to any identified or potential victims of this investigation.

12.  Any travel records related to identified victims or potential victims.

13.  All records relating to the Intensive Supervision of Aliens Program.

14.  Any identity documents or copies of identity documents for any known or potential victims.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.  examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.  searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.  surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.  opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed

electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

AO 93  (Rev. 11/13) Search and Seizure Warrant                    AUSA Christopher V. Parente, (312) 886-2447

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**UNDER SEAL**

In the Matter of the Search of:

The single-family home located at 3110 South 53rd
Court, Cicero, Illinois, further described in
Attachment A

Case Number:

# 19M207

## SEARCH AND SEIZURE WARRANT

To: Ashley N. Kizler and any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of
the following person or property located in the Northern District of Illinois:

**See Attachment A**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person
or property described above, and that such search will reveal:

**See Attachment B**

**YOU ARE HEREBY COMMANDED** to execute this warrant on or before <u>April 8, 2019</u> in the daytime (6:00
a.m. to 10:00 p.m.).

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to the issuing United States Magistrate
Judge.

2:55 PM

Date and time issued: <u>March 25, 2019</u>                    _____
                                                                                            *Judge's signature*

City and State: <u>Chicago, Illinois</u>                         JEFFREY COLE, U.S. Magistrate Judge
                                                                                            *Printed name and title*

AO 93 (Rev. 11/13)  Search and Seizure Warrant (Page 2)

## Return

| Case No: | Date and Time Warrant Executed: | Copy of Warrant and Inventory Left With: |
|---|---|---|
| | | |

Inventory made in the presence of:

Inventory of the property taken and name of any person(s) seized:

## Certification

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

The residence and detached garage is located at 3110 South 53rd Court, in Cicero, Illinois. The residence is a single family home, brown in color, with a white door, and depicted below:



# ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

Evidence, instrumentalities, and fruits concerning violation of Title 18, United States Code, Sections 1581, 1584, 1589, and 1590, as follows:

1. Cell phones.

2. Cash.

3. All financial documents, including bank statements, check books, invoices, ledgers, currency exchange records, receipts, and credit card statements.

4. All notebooks containing handwritten notations relating to known or potential victims.

5. All items relating to Victims A-D and their children.

6. Indicia of ownership or occupancy of the Subject Residence.

7. Written documents containing rules or instructions to individuals living inside the residence.

8. Any documents bearing the names or identifying information of any known or potential trafficking victims.

9. All documents relating to the trafficking and forced labor of known or potential victims.

10. All employment documents related to the employment of any identified or potential victims of this investigation.

11.     All immigration documents, including passports, lawful permanent resident cards, and other immigration forms or correspondence relating to any identified or potential victims of this investigation.

12.     Any travel records related to identified victims or potential victims.

13.     All records relating to the Intensive Supervision of Aliens Program.

14.     Any identity documents or copies of identity documents for any known or potential victims.

## ADDENDUM TO ATTACHMENT B

Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant authorizes the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol:

The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

a.     examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.     searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.     surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B; and

d.     opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed

electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.